## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MICHAEL SNYDER,

      Plaintiff,

      v.

ALEX AZAR, *in his official capacity as*
*Secretary of the U.S. Department of Health and*
*Human Services*,

      Defendant.

Civil Action No. TDC-18-0511

### MEMORANDUM OPINION

Plaintiff Michael Snyder filed this civil action against the Secretary of Health and Human Services ("HHS") in which he has alleged that he was subjected to unlawful race and sex discrimination, a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018), and unlawful age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (2018), while working at the National Institutes of Health ("NIH"), a component agency of HHS. Pending before the Court is HHS's Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, HHS's Motion will be GRANTED.

### BACKGROUND

### I.     NIH Employment

Snyder, who is a white male over the age of 60, worked from May 2010 until his retirement in May 2017 as a Systems Accountant at the General Schedule-14 ("GS-14") level at the NIH

Business Systems ("NBS") Operations and Maintenance Division on the Budget, General Ledger, and Grants team.  At NBS, Snyder's first-level supervisor was Carol Perrone, GS-15, Director of NBS Operations and Maintenance; Snyder's second-level supervisor was Charles Singleton, GS-15, Director of NBS.  Perrone was born in Guyana and identifies as a West Indian female; Singleton identifies as a white male.

In May 2016, Perrone hired Sophia Ferrer, who is female and identifies as Black, into the role of a GS-14 Systems Accountant at NBS.  Ferrer's role was the General Ledger lead.  Ferrer was not a formal supervisor, but because all areas of accounting affect the general ledger, the other System Accountants necessarily had to report on and coordinate their activities with Ferrer.

### A.    NBS Meeting

In June 2016, Perrone assigned Ferrer the responsibility of reviewing NBS inter-agency agreements ("IAA") to identify any accounting guideline compliance problems and to develop solutions to any issues that were uncovered.  Ferrer initially attempted to gather information for this project by email from Snyder and another Systems Accountant, Doris "JoJo" Ferguson, but did not receive any responses.  Perrone then held meetings on June 27 and 28, 2016 to advise staff that they were expected to meet with Ferrer to review the system processes with her.  Pursuant to this objective, Ferrer scheduled a June 29, 2016 meeting to discuss the IAA review ("the NBS Meeting"), which was attended by Ferrer, Snyder, Ferguson, and Mangeshwer Kulkarni, a contractor with NBS.  Perrone was scheduled to attend but arrived late.

According to Snyder, before Perrone arrived, Ferrer began acting "belligerently" and spoke to Snyder in a "derisive, abusive, disrespectful, threatening and condescending manner."  Joint Appendix ("J.A.") 3, ECF No. 43.  Fearful that the meeting was set up to cause him harm, Snyder then left the conference room.  Once outside, Snyder saw some of his co-workers, who questioned

2

him as to what was going on because they heard Ferrer speaking loudly through the closed door. Several of them told him that they believed he was being targeted by NBS management.

Other attendees at the NBS Meeting, however, described this initial exchange differently. According to Ferrer, almost from the beginning of the meeting, Snyder was extremely agitated and was "shouting" that he did not understand the purpose of the exercise or what Ferrer was asking of him. J.A. 166. Ferrer asserts that at one point, Snyder used the term "sweetheart" to refer to her, after which Ferrer reminded him of her first name and requested that he not call her that anymore. *Id.* In an attempt to get the meeting back on track, Ferrer provided Snyder with an example of what she was seeking from the meeting, but Snyder became increasingly more agitated and began yelling, shifting around in his chair, and ultimately jumped up. According to Ferrer, Snyder then grabbed his water bottle off the table, with both fists clenched, and lunged at Ferrer "as if he wanted to kill her." J.A. 167. Ferrer states that she was scared and fearful that Snyder would hit her, but Snyder then left the room while shouting, "I don't have to listen to this crap." *Id.*

Kulkarni, who was present for the NBS Meeting, has stated that from the outset, Snyder acted inappropriately, was obnoxious, refused to cooperate, called Ferrer names, and was unprofessional. Although Ferrer was "asking all the appropriate questions," Snyder was growing frustrated and agitated, and he was shaking and moving around in his chair and making "the rest of us feel uncomfortable." J.A. 153. According to Kulkarni, as Snyder jumped up from his chair, he had a reusable water bottle in his left hand and appeared to lean towards Ferrer. Kulkarni thought Snyder was going to hit Ferrer with the bottle, but she moved away, and Snyder turned and left the room, yelling and slamming the door behind him. At that point, Kulkarni also left the NBS Meeting.

3

Ferguson has asserted that during the NBS Meeting, Ferrer asked Snyder to provide an overview of an issue but then cut off Snyder while he was speaking and disagreed with him, things she had done to others in the past. Snyder kept talking, but at one point he "exploded out of his chair and stormed out." J.A. 150. To Ferguson, it appeared that Snyder took a step or two towards Ferrer but then "corrected himself" and "stepped around her." *Id.*

Snyder later returned to the conference room. At that point, Perrone had arrived. According to Snyder, she supported Ferrer in her "obnoxious, un-cooperative, disrespectful, argumentative and very threatening behavior" directed at him. J.A. 4. Snyder alleges that at this point, both Perrone and Ferrer became "abusive, and physically threatening, disruptive, [and] bullying" and would not let him explain or provide clarifying points to defend himself during the dispute. *Id.* Perrone, however, asserts that after she joined the NBS Meeting, Ferrer tried to explain what had transpired, but Snyder was disruptive and would not let her finish speaking. Snyder kept interrupting Perrone and yelling over her as she tried to speak. According to both Perrone and Ferguson, during the exchange Snyder referred to Ferrer by the terms "sweetheart" and "dear" even when Ferrer asked that he use her first name. J.A. 151, 156. When Snyder told Perrone that she had previously called him "sweetheart," Perrone responded that she had never used that term with Snyder before. J.A. 156. Snyder did not use Ferrer's name but instead referred to her as "this lady." J.A. 151.

After the NBS Meeting ended, Kulkarni checked in on Ferrer and observed that she appeared to be afraid to move around within the office for fear of running into Snyder, whose office was near her office. As a result, for some period of time after the NBS Meeting, Kulkarni escorted her around the office and to her car in the evenings.

4

**B.**     **Suspension**

After the NBS Meeting, Ferrer filed an equal employment opportunity ("EEO") complaint alleging sexual harassment by Snyder and also filed a complaint with the NIH Civil Division because she believed that Snyder had physically threatened her with the water bottle. Following the complaints, Robin Turley, an Employee Relations Specialist, advised Perrone that the standard procedure for sexual harassment claims required Perrone to issue a Cease and Desist Memorandum ("C&D Memo") to both Snyder and Ferrer, to physically separate them, and to conduct a management inquiry into the complaint. Turley provided Perrone with the C&D Memo, which Perrone presented to both Snyder and Ferrer on August 1, 2016. The C&D Memo stated that, effective immediately, the two were not allowed to communicate with each other until after the completion of the management inquiry.

At the recommendation of LaVerne Stringfield, the NIH Executive Officer, the physical separation was accomplished by moving Snyder to another building. On August 3, 2016, Singleton issued a memorandum to Snyder informing him of a "Temporary Duty Change" from one NIH building to another, both located in Bethesda, Maryland. J.A. 181. During this period of reassignment, Snyder was to report to Lawrence Plomann, Director of NBS Technical Infrastructure. Snyder's primary assigned duties would continue, but some duties were adjusted to the extent that they would have required interaction with Ferrer. According to Snyder, during this period of reassignment, no provisions were made for him to call into certain meetings of only federal employees ("Fed Only meetings"), even though he requested dial-in information. Perrone claims that Snyder was never told that he could not attend the Fed Only meetings and that he did not communicate that he wanted to continue attending.

5

The management inquiry into Ferrer's sexual harassment complaint ("the Management Inquiry") was conducted by an independent contractor, Karen Ellis of Susan Grimes Associates, Inc., from August 17, 2016 to September 13, 2016. Ellis interviewed all of the NBS Meeting attendees, and reviewed emails and other documentation. Upon completion of the Management Inquiry, Ellis concluded that, based on the evidence that Snyder had exhibited anger and appeared to make a move toward Ferrer before correcting himself, which caused Ferrer to feel physically threatened, and his inappropriate use of terms such as "sweetheart," "dear," and "this lady," there was "sufficient evidence to continue progressive discipline of [Snyder] for his misconduct." J.A. 171.

On January 18, 2017, Perrone issued to Snyder a "Notice of Proposed Five (5) Calendar Day Suspension," J.A. 183–186, which informed Snyder that she was proposing such a suspension based on the nature and seriousness of the offense, his job level and type of employment, his past disciplinary record, and the NIH Table of Penalties, which recommends a range of disciplinary actions based on the nature of the misconduct and whether it was the first, second, or third action. After Snyder was informed that he had the right to respond to the proposed suspension, he submitted a written response.

On February 23, 2017, Singleton issued a final decision on the proposed suspension and formally imposed a five-day suspension without pay. In his written decision, Singleton relied in part on the facts that Snyder had a previous incident of misconduct in which he sent an email that was derogatory of a government contractor, which resulted in a two-day suspension, and that the NIH Table of Penalties provides that the penalty for a second offense of this type ranges from a five-day suspension to removal. J.A. 199. Singleton rejected Snyder's claim that Perrone's

6

reassignment of Snyder was retaliatory, noting that it was based on human resources ("HR") guidance. J.A. 198.

Snyder served the five-day suspension from February 27, 2017 through March 3, 2017, after which Snyder moved back to his original NBS office. Snyder then requested a reassignment back to work under Plomann because the dynamics of the office were so "awkward," and he believed that Perrone "would continue to support workplace violence and bullying against me and any other person at NBS that has supported me." J.A. 19. Perrone denied the request on the grounds that an ongoing hiring freeze prevented it. On May 31, 2017, Snyder retired from NIH.

## II.  **Complaints about Ferrer**

During her time at NBS, Ferrer has been the subject of several complaints relating to verbal harassment of NIH employees and contractors. In September 2016, Samba Vedula, another NBS Systems Accountant, filed an EEO complaint against Ferrer based on an incident on September 14, 2016 when Ferrer entered his office and verbally berated him in front of colleagues. At least two other personnel, Ferguson and Phil Hwang, a purchase specialist, also filed EEO complaints against Ferrer based on alleged verbal harassment. Ferguson's claim was ultimately dropped. Snyder also filed an EEO complaint relating to Ferrer, but this complaint was a challenge to his suspension rather than a harassment complaint against Ferrer.

On December 20, 2016, Snyder, Vedula, and Hwang met with two officers at the NIH Civil Division to assert allegations of bullying and workplace violence by Ferrer against them. Snyder has stated in an affidavit that after the three contacted the office to make their complaint, they were "promised an investigation" into their allegations, but by the time Snyder retired on May 31, 2017, neither Snyder, Hwang, nor Vedula had received a copy of the investigative report. J.A. 320. Although Perrone has asserted that a management inquiry into these allegations concluded that

7

they were unfounded, Snyder contends that the focus of the inquiry ended up centering not on workplace violence at NBS, but on an unrelated upgrade project. In 2018, two other harassment complaints against Ferrer were filed with the NIH Civil Division, one by Kimberly Johnson, a government contractor who is now an NIH employee, and the other by a government contractor.

Ultimately, Ferrer did not receive any formal discipline as a result of these complaints. Rather, before Vedula filed his EEO complaint, Perrone unsuccessfully suggested that the matter should be addressed by arranging for a dialogue between Vedula and Ferrer before the NIH ombudsman. In January 2017, because of the various complaints, Perrone engaged a training coach to work with Ferrer on her interpersonal skills. Ferrer asserts that she received a lower performance evaluation score based on the incident with Vedula. According to Perrone, however, no actual discipline was imposed because HR investigations into these complaints did not result in conclusive findings against Ferrer.

Separately, Snyder has alleged that the hiring process for the Systems Accountant Leader position for which Ferrer was selected in January 2017 was unfair because the position was posted for only three days in December 2016, because Perrone tailored the requirements and interview questions to relate to Ferrer's strengths and then improperly shared the questions with Ferrer before the interviews, and because the members of the interview panel were not informed of the various complaints that had been filed against Ferrer. Snyder lodged a complaint with NIH Director Francis Collins about the hiring process, including by sending an email to Collins on January 12, 2017 in which he identified deficiencies in the hiring process and sought Collins's intervention because NBS management appeared to be "in strong favor of promoting" Ferrer, who had a history of "violent confrontations with co-workers in public settings." J.A. 346.

8

## III.    Procedural History

On August 17, 2016, as the Management Inquiry was beginning, Snyder initiated contact with the NIH Office of Equal Employment Opportunity ("the EEO Office") and raised claims of discrimination arising from the C&D Memo and the temporary reassignment. After efforts to resolve the matter through EEO counseling were unsuccessful, Snyder filed a formal discrimination complaint on November 17, 2016. After a federal agency investigation conducted between December 28, 2016 and June 6, 2017, HHS issued a Final Agency Decision on November 22, 2017 concluding that Snyder was not subjected to discrimination as claimed. On February 23, 2018, Snyder filed a timely Complaint in this Court.

## DISCUSSION

In its Motion for Summary Judgment, HHS argues that based on the record evidence, Snyder cannot establish a *prima facie* case of discrimination or retaliation under Title VII, or discrimination under the ADEA, because Snyder has not shown an adverse employment action against him, and he ultimately cannot establish that HHS's legitimate, non-discriminatory and non-retaliatory reasons for any adverse actions against him were pretextual. HHS also argues that there is insufficient evidence to support a claim of a hostile work environment.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*,

9

346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## II.   Disparate Treatment

In Counts I and IV, Snyder alleges discriminatory disparate treatment on the basis of race, sex, and age in violation of Title VII and the ADEA. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Relatedly, the ADEA provides that "[a]ll personnel actions" affecting federal agency employees "who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Both statutes require a plaintiff to establish a claim through one of two methods. As relevant here, the plaintiff may either demonstrate through direct or circumstantial evidence that race, sex, or age "motivated the employer's adverse employment decision," or the plaintiff may proceed through the approach espoused in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004); *see Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (holding that the *McDonnell Douglas* framework applies to ADEA claims). Under the *McDonnell Douglas* framework, the employee must first establish a *prima facie* case of discrimination. *Hill*, 354 F.3d at 285. If the employee does so successfully, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Finally, if such a showing is made, the burden shifts back to the plaintiff to prove "by

10

a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.* Snyder alleges no direct evidence that any adverse employment actions were based on his race, sex, or age. He therefore must establish his case through the *McDonnell Douglas* framework.

### A. *Prima Facie* Case

To establish a *prima facie* claim for discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). Where HHS disputes only the third and fourth elements, the Court addresses only those two requirements below.

### 1. Adverse Employment Action

"An adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

Snyder has identified a range of allegedly discriminatory actions against him, including general claims of preferential treatment of Ferrer, the accusation of sexual harassment against him, the C&D Memo, his temporary reassignment to a different location, his inability to participate in certain Fed Only meetings relevant to his work, the suspension without pay, and the denial of his

request to return to work under Plomann. HHS correctly argues that most of these actions do not qualify as adverse employment actions for purposes of a Title VII or ADEA claim because they do not affect the terms, conditions, or benefits of employment. *See Holland,* 487 F.3d at 219. First, Snyder's general allegations that Ferrer received preferential treatment, such as being designated to fill in for Perrone and allowed to use Perrone's parking space in her absence, do not establish an adverse employment action because such treatment alone did not impact his job duties, title, compensation, or benefits in a tangible way. *See English v. Perdue,* 777 F. App'x 94, 99–100 (5th Cir. 2019) (finding that "preferential treatment" was "not cognizable as an adverse employment action"); *Gibson v. Valley Ave. Drive-In Restaurants, LLC,* 597 F. App'x 568, 570 (11th Cir. 2014) (affirming a district court's finding that various instances of preferential treatment of certain male employees "were not sufficiently significant to constitute an adverse employment action").

Second, the issuance of the C&D Memo also did not constitute an adverse employment action because, by itself, it merely served as a notice to temporarily cease communication and contact with a colleague pending an investigation and did not change Snyder's "terms and conditions of employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004); *see also Sanchez v. California*, 90 F. Supp. 3d 1036, 1057 (E.D. Cal. 2015) ("The Court finds that the cease and desist memorandum and written counseling were not adverse employment actions as they did not affect the terms, conditions and privileges of Plaintiff's employment."). For the same reason, the fact that Snyder was subjected to a sexual harassment complaint does not, by itself, constitute an adverse employment action.

Third, although Snyder asserts that his temporary assignment to work in a different office under a different supervisor constituted disparate treatment because Ferrer was not similarly

moved after Vedula filed a complaint about her, this reassignment was not an actionable adverse employment action. "The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *James*, 368 F.3d at 376. A reassignment at the same salary level, even one causing "modest stress not present in the old position," constitutes an adverse employment action only where there was a "significant detrimental effect," such as "[a] decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Holland*, 487 F.3d at 219 (quoting *Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999)). Thus, a "purely lateral transfer" does not qualify. *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 331 (5th Cir. 2004); *see also Ryburn v. Potter*, 155 F. App'x 102, 107–08 (5th Cir. 2005) (holding that an employee's temporary shift from one location to another did "not amount to an adverse employment action, especially where . . . the jobs entailed essentially the same benefits, duties, and responsibilities as the old position").

Here, although Singleton has stated that Snyder's duties changed somewhat with the temporary reassignment in order to avoid contact with Ferrer, Snyder has acknowledged that at the time of the reassignment he received no Performance Management Appraisal Plan ("PMAP") changes, that he "was expected to continue on with the assigned customer support tasks in the same areas that had been assigned in his PMAP," J.A. 47–48, and that he had the "same job duties" during the reassignment, J.A. 96. While Snyder has testified that the reassignment made it more difficult to perform his duties because he was not given the same system access as he had before and he was excluded from important Fed Only meetings when no call-in information was provided, such changed circumstances do not establish an adverse employment action. Even accepting these claims, the Court finds no evidence of how Snyder's inability to attend an unspecified number of Fed Only meetings during the months of the reassignment adversely affected his pay, level of

13

responsibility, or future opportunities. *See James*, 368 F.3d at 377 (finding that the plaintiff's claim that he was "excluded from important meetings" during a reassignment did not support a finding of an adverse employment action). Thus, the temporary reassignment was not an adverse employment action for purposes of a federal discrimination claim. *See id.* at 376–77 (granting summary judgment in part because a reassignment to a "less appealing" position at the same title, pay, and benefits did not constitute an adverse employment action). For the same reasons, the denial of Snyder's request to return to the lateral reassignment after his suspension also was not an adverse employment action.

Nevertheless, Snyder was subject to an adverse employment action when, following the Management Inquiry into Ferrer's sexual harassment claim, he was given a five-day suspension without pay on February 23, 2017. *See, e.g., Greer v. Paulson*, 505 F.3d 1306, 1317–18 (D.C. Cir. 2007) (in finding that placement on absent-without-leave and leave-without-pay status could be an adverse employment action for purposes of race discrimination, noting that "a suspension without pay" could be an adverse employment action); *Whittaker v. N Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2007) ("[A] suspension without pay . . . would constitute an adverse employment action."). Thus, while the majority of the actions identified by Snyder do not constitute actionable employment actions for purposes of establishing a *prima facie* case of discrimination, the Court finds that the suspension of Snyder for five days without pay qualifies as an adverse employment action because it had a "significant detrimental effect" by causing a "decrease in compensation." *See James*, 368 F.3d at 376. The third prong of the *prima facie* case is therefore satisfied.

### 2.    Similarly Situated Employees

Where Snyder's discrimination claims are based on a disparate treatment theory, the Court considers the fourth element of the *prima facie* case, whether there were similarly situated

14

employees outside the protected class who received favorable treatment under comparable circumstances. *See White*, 375 F.3d at 295. At the outset, Snyder disputes whether he is required to present comparator evidence at all if he is able to offer evidence of pretext for an employer's actions. Snyder is correct that a plaintiff in a discrimination case is "not required as a matter of law to point to a similarly situated . . . comparator in order to succeed on a . . . discrimination claim." *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). Here, however, where Snyder has based his claim mainly upon a comparison of HHS's treatment of him as compared to Ferrer, "the validity of [his] prima facie case depends upon whether that comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Snyder also has the burden "to demonstrate that similarly situated employees were not treated equally." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

Where Snyder's only viable adverse employment action is his suspension following the investigation into possible sexual harassment of Ferrer, Snyder's disparate treatment claim amounts to one of discriminatory discipline based on a theory that Ferrer, a black woman, was treated more favorably than Snyder following complaints from co-workers. In assessing whether there is a proper comparator group, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). That showing typically includes evidence that the employees "dealt with the same supervisor . . . [were] subject to the same standards[,] and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct." *Hurst v. Dist. of Columbia*, 681 F. App'x 186, 191 (4th Cir. 2017) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the

15

would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination." *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)). "The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985).

HHS asserts that Snyder cannot satisfy this prong because he has not identified anyone outside his protected classes who was accused of sexual harassment but treated more favorably. Snyder, however, identifies as a comparator Ferrer, who is not white, not male, and is younger, and who has been the subject of several harassment complaints by co-workers but who was not issued a C&D Memo, temporarily transferred, or suspended without pay as a result of those complaints. Like Snyder, Ferrer reported to Perrone and was a GS-14 Systems Accountant. Both were therefore subject to the same NIH Anti-Harassment Policy that applied to all staff. Where Snyder and Ferrer reported to the same supervisor, had the same title and GS-level, and were held to the same professional conduct standards at NIH, Ferrer was similarly situated as to all of these factors. *Cf. Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007) (holding that "[i]f different decision-makers are involved, employees are generally not similarly situated"); *cf. Austen v. HCA Health Servs. of Virginia, Inc.*, 5 F. App'x 253, 254 (4th Cir. 2001) (holding that a male employee with "more supervisory authority than the female employees and a record of disciplinary warnings" was not a similar comparator).

As to their conduct subject to discipline, HHS argues that Ferrer was not the subject of any sexual harassment claims and thus was not subject to discipline in the same manner. As

acknowledged by Perrone, however, Ferrer has been the subject of at least six formal complaints of workplace harassment by co-workers. Most notably, another Systems Accountant, Samba Vedula, filed a complaint against Ferrer in September 2016. Vedula recounted that on September 14, 2016, while he was meeting with other personnel in his office, Ferrer came "barging" in and yelled at him for several minutes about certain tasks he had allegedly performed incorrectly. J.A. 354. Vedula stated that those in his office were "shocked" by what had transpired, and he was "in tears" as a result of the interaction. J.A. 354. Because Perrone was on vacation that day, Vedula reported the incident to Singleton. When Perrone returned, she downplayed the matter as related to interoffice communications, then suggested that it could be resolved through the ombudsman. J.R. 356. After meeting with the ombudsman, Vedula decided to file a formal EEO complaint against Ferrer based on his belief that he was subjected to discrimination based on race, national origin, sex, and religion. Thus, even though Vedula did not assert a claim against Ferrer for sexual harassment, he filed a formal complaint about similar conduct—verbal abuse in front of other colleagues over work-related matters—as was at issue in the complaint against Snyder. In the end, Ferrer received no formal reprimand and no suspension.

Beyond the incident with Vedula, Ferrer was also the subject of several other complaints of alleged verbal harassment. Ferguson also filed a formal EEO complaint against Ferrer relating to the way Ferrer spoke to her, though she later dropped the complaint. Hwang, a purchase specialist in NBS, also filed a harassment claim. In December 2016, Snyder, Vedula, and Hwang submitted a complaint to the NIH Civil Division about bullying and workplace violence by Ferrer. Then, in 2018, two contractors, one of whom is now an NIH employee, both individually filed harassment claims against Ferrer as well. In total, Ferrer was the subject of at least six harassment claims based on interactions with colleagues. Yet Ferrer was treated differently in that following

17

these complaints, she was subjected only to meetings with an ombudsman and an external trainer on interpersonal relationships, and a reduction in her performance evaluation score after Vedula's complaint. She never received any discipline based on these incidents.

Although HHS has noted that none of these complaints were sexual harassment complaints, which are subject to certain different procedures, where the allegations were similar enough to those made against Snyder, and Ferrer was in the same position within the organization as Snyder, the Court concludes that Snyder has presented sufficient evidence to meet the fourth prong and to establish a *prima facie* case of discrimination.

### B.    Legitimate Non-Discriminatory Reason

Where Snyder has met his burden to establish a *prima facie* case of discrimination, the burden shifts to HHS to show a legitimate, non-discriminatory reason for the adverse employment action. *See Hill*, 354 F.3d at 285. This burden is "only one of production, not persuasion." *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998). Because this step "precedes the credibility-assessment stage," all that is required of the defendant at this point is the introduction of evidence which, if "*taken as true*, would *permit* the conclusion" that there was a non-discriminatory reason "for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

Here, HHS claims that Snyder's suspension, which, as discussed above, is the only adverse employment action at issue in this case, was the result of an independent investigation into the allegation of sexual harassment by Ferrer. In particular, the Management Inquiry, which was conducted by an external, independent contractor and included interviews with Snyder and all other individuals present at the NBS Meeting, concluded that the evidence supported "progressive discipline for Snyder for his misconduct." J.A. 171. In support of this conclusion, the Management Inquiry found evidence that Snyder was "argumentative and exhibited anger," that

18

Snyder appeared to make a move toward Ferrer as if to hit her, and that Snyder "inappropriately referred to Ms. Ferrer as 'sweetheart,' 'dear,' and 'this lady,'" even after he was asked not to use those terms. *Id.* In fact, Snyder himself admits to using these terms. It also found that Snyder had a history of "inappropriate conduct." *Id.* Although there may be a factual dispute over what actually happened at the NBS Meeting, there can be no dispute that the independent Management Inquiry concluded that Snyder had engaged in misconduct warranting discipline. Moreover, it is undisputed that Snyder had a prior two-day suspension for misconduct involving the sending of a derogatory email and that, as a result, the five-day suspension was at the low end of the range of sanctions contemplated by the NIH Table of Penalties for this type of misconduct. Thus, where HHS has provided evidence that Snyder's suspension was the result of an independent Management Inquiry and was based on the NIH Table of Penalties, HHS has provided evidence of a legitimate, non-discriminatory reason for Snyder's five-day suspension based on his conduct in the NBS Meeting. *See Holland*, 487 F.3d at 214 (holding that the employer met its burden of providing a legitimate non-discriminatory reason for the plaintiff's firing by producing affidavits and testimony demonstrating that the plaintiff had made threats toward another individual); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (finding that an employer's reasons for terminating an employee, which included sexual harassment allegations as well as job performance issues and a failure to follow procedures, constituted legitimate, non-discriminatory reasons).

## C.   Pretext

If the defendant makes a showing of a legitimate, non-discriminatory reason for an adverse employment action, the burden then shifts back to the plaintiff to show that the stated reason was a "pretext for discrimination." *Hill*, 354 F.3d at 285. Snyder ultimately bears the burden to show

19

by a preponderance of the evidence that HHS's explanations are "pretextual or otherwise unworthy of credence." *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 275 (4th Cir 1995).

Snyder does not identify any persuasive evidence that the five-day suspension was made for a reason other than the findings of the Management Inquiry. The only specific evidence Snyder offers as to pretext is that Ferrer acknowledged that Perrone and Singleton were apparently pleased with Snyder's ultimate retirement in May 2017, about three months after the suspension, which does not by itself demonstrate discrimination.

Snyder's argument thus rests on the claim that Ferrer, a Black female, received more lenient treatment when she was the subject of harassment complaints, as she never received formal discipline. Although it is undisputed that Snyder was treated more severely, this distinction is at least in part explained by the fact that the complaint against Snyder was for sexual harassment, which requires NIH to impose a temporary separation and to order a management inquiry. In contrast, there is no evidence that Ferrer was the subject of a sexual harassment complaint, and Snyder has not shown that a management inquiry was required for the types of complaints filed against Ferrer. Moreover, Perrone provided undisputed testimony that she could take disciplinary action against an employee only if an investigation found a basis to impose discipline, and that no such findings were ever made relating to Ferrer. In the absence of "concrete evidence" against Ferrer, management was limited to tools such as training and engagement with the ombudsman. J.A. 128. Under these circumstances, Snyder has not provided sufficient evidence to show that the disparate treatment was improper.

Even if, viewing the evidence in the light most favorable to Snyder, the Court could find that there was no principled reason for the disparate treatment, he has not provided sufficient evidence to support the conclusion that the actual reason for the differential treatment was race,

sex, or age discrimination. Snyder has identified no instance in which Ferrer, Perrone, or Singleton said anything derogatory or offensive about his race, age, or sex. Notably, the actual decisionmaker on the suspension was Singleton, a white male, who made the decision after consideration of the Management Inquiry's evidence and Snyder's response to Perrone's suspension proposal. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (stating that in a Title VII case, "[i]t is the decision maker's intent that remains crucial"); *James v. Verizon*, 792 F. Supp. 2d 861, 869–870 (D. Md. 2011) (holding that evidence that the decision maker is a "member of the same protected class" as the plaintiff "weakens any possible inference of discrimination"). Moreover, the alleged victims of Ferrer's harassment included both men and women and people of different races, including JoJo Ferguson and Kimberly Johnson, both women who filed harassment complaints against Ferrer that did not result in any discipline. Though Snyder also references an allegedly unfair promotion process through which Ferrer was promoted to Systems Accountant Leader, the unselected candidates included both men and women, and the decisionmakers in that process were not Singleton or Perrone, but three NIH officials entirely unconnected to Snyder's suspension. Thus, where there is a legitimate non-discriminatory reason for Snyder's suspension, even if Ferrer received more favorable treatment in response to complaints by co-workers, there is insufficient evidence to support the conclusion that the actual reason that Snyder received a suspension rather than a lesser sanction was discrimination based on race, sex, or age. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989) (holding that a plaintiff fails to demonstrate pretext where the only evidence of discriminatory intent is the plaintiff's own assertions and subjective beliefs). Because Snyder has failed to establish a genuine dispute of material fact whether HHS's suspension of Snyder was

pretextual and not in fact based on his behavior during the NBS Meeting, the Court will grant the Motion as to Snyder's claims of race, sex, and age discrimination.

### III.   Hostile Work Environment

In Count II, Snyder also alleges a hostile work environment based on race and sex in violation of Title VII. A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006). "In measuring whether the offensive conduct is severe or pervasive enough to warrant relief, we must look at the totality of the circumstances, including: the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

Snyder asserts that behavior by Ferrer and Perrone created a hostile work environment. Snyder's allegations begin with the June 29, 2016 NBS Meeting incident that led to the issuance of the C&D Memo, the temporary reassignment, and ultimately the five-day suspension of Snyder without pay, after which certain co-workers told Snyder that he was being "targeted." J.A. 3. Even viewing the evidence in the light most favorable to Snyder, Ferrer's conduct at the NBS Meeting,

at which she was allegedly dismissive of Snyder and cut him off in conversation multiple times, was not sufficiently severe to establish a hostile work environment by itself. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that Title VII is not a "general civility code" and that "isolated incidents (unless extremely serious)" will not constitute a hostile work environment). As for other instances of direct harassment against him, Snyder reports only an incident on August 3, 2016 when, while he was trying to use the fax machine near Ferrer's office, an NBS HR official, Shante Thompson, informed him that Ferrer had told her that Snyder was stalking her. He has not identified other specific incidents of direct harassment or verbal abuse against him. The temporary transfer and suspension of Snyder following the NBS Meeting, as well as the allegedly improper efforts to arrange for Ferrer's promotion to the Systems Accountant Leader position, even if unfair, do not constitute the type of threatening, humiliating, or offensive conduct that typically underlies a hostile work environment claim. *See Mosby-Grant*, 630 F.3d at 335.

Snyder also asserts, however, that he has witnessed other instances of Ferrer's "violent behavior in the workplace" and has been told by co-workers of "similar, troubling and threatening encounters of their own with [Ferrer]," which "create[d] a work atmosphere of fear and uncertainty." J.A. 13; *see Hoyle v. Freightliner, LLC*, 650 F.3d 321, 333 (4th Cir. 2011) (finding that the "totality of the circumstances," including conduct directed against others, may be considered in evaluating a plaintiff's hostile work environment claim). As discussed above, Vedula, Ferguson, Hwang, and two contractors working with the NBS team all filed formal complaints against Ferrer relating to verbal abuse and harassment, and Snyder, Vedula, and Hwang filed a joint complaint alleging that Ferrer bullied others. In addition to the specific incident recounted by Vedula in which Ferrer barged into her office to berate him, Vedula has testified that Ferrer was known to "yell[] at a lot of people on the floor." J.A. 356. Snyder also cites Ferrer's

acknowledgment that she and Perrone discussed giving tasks to Vedula and Hwang that would set them up for failure, create an opportunity for Perrone to berate them in meetings with others, and ultimately put pressure on them to leave their jobs.

Viewing the evidence in the light most favorable to the nonmoving party, Snyder has described a work environment that included severe and pervasive verbal abuse of NBS personnel by Ferrer that extends beyond isolated offensive utterances. Where there is evidence that both Perrone and Singleton were informed of the pattern of verbal harassment through the multiple formal complaints, that Perrone collaborated in some of the alleged verbal abuse, and that rather than discipline her for the abuse, Perrone took steps to assist in Ferrer's promotion, there is a genuine issue of fact whether management was aware of and condoned the abusive conduct.

Nevertheless, even if Snyder could show that severe and pervasive harassment was sufficiently directed at him to establish that he was subjected to a hostile work environment, he has not presented adequate evidence that such harassment was based on race or sex. Snyder has not identified any instances in which Perrone or Ferrer used any derogatory language or conduct associated with race or sex or even referenced the fact that he is white and male. *Cf. Boyer-Liberto*, 786 F.3d at 280 ("[A] reasonable jury could find that [the supervisor's] two uses of the "porch monkey" epithet ... were severe enough to engender a hostile work environment."). Although Snyder notes that of the 15 federal employees that Perrone supervises, five are male and three of those five have filed complaints against Perrone, he has stated in his own declaration that both men and women in NBS have filed complaints against NBS management. The individuals who have filed complaints against Ferrer span multiple races and include at least two women: Ferguson, who also filed an EEO complaint relating to Ferrer's verbal harassment, and Johnson, a contractor who filed a complaint with the NIH Civil Division.

24

Thus, even if Snyder may be able to show that the behavior he experienced at NBS was severe or pervasive, he has not presented sufficient evidence to create a genuine issue of material fact whether any hostile work environment was based on race or sex as necessary to establish a violation of Title VII. *See, e.g., Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 94 (1st Cir. 2018) (granting summary judgment on a hostile work environment claim based on sex because there was a "plethora of reasons" that the plaintiff's superiors may have yelled and screamed at her but not her male employees that had no nexus to her sex, and the plaintiff had not "done enough dot connecting for us to conclude that the harassment" was based on sex). The Court will grant HHS's Motion as to this claim.

## IV.    Retaliation

Finally, in Count III, Snyder alleges retaliation in violation of Title VII. A retaliation claim brought under Title VII also follows a burden-shifting framework analogous to the discrimination framework set forth in *McDonnell Douglas*:

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted); *cf. McDonnell Douglas*, 411 U.S. at 802–04.

### A.    *Prima Facie* Case

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer-Liberto*, 786 F.3d at 281. For a retaliation claim, a "materially adverse" action is one which "well might

25

have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). HHS does not dispute that Snyder engaged in protected activity by filing an informal complaint with the EEO Office in August 2016, and that the suspension of Snyder in February 2017 constituted a materially adverse action against Snyder. HHS instead argues that Snyder cannot establish a *prima facie* case of retaliation because only certain actions adverse to Snyder took place after his first EEO contact, and the remainder of the actions that postdate this contact are not causally linked because the temporal gap between the two events is too extended.

As stated in the Final Agency Decision on Snyder's EEO complaint, Snyder made his first contact with the EEO Office to raise claims of discrimination on August 17, 2016. Thus, for the purposes of his retaliation claim, only actions HHS took after this date could potentially be deemed retaliatory. *See Baqir*, 434 F.3d at 748 (holding that an employer must have known about an employee's protected activity in order to have engaged in unlawful retaliation); *see also Buchhagen v. ICF Int'l, Inc.*, 650 F. App'x 824, 830 (4th Cir. 2016) (holding that "an employment action cannot be adverse when the action was contemplated before the protected activity occurred"). Accordingly, neither the issuance of the C&D Memo on August 1, 2016 nor Snyder's temporary reassignment imposed on August 3, 2016 can constitute retaliation. Only Snyder's five-day suspension without pay imposed on February 23, 2017 qualifies as a materially adverse action.

Snyder argues that separate and apart from the question of whether the suspension was retaliatory, HHS engaged in *per se* retaliation because Perrone informed Ferrer of Snyder's EEO complaint and thus failed to take proper precautions to secure the confidentiality of EEO information. In support of this proposition, Snyder relies on an EEOC administrative appeal decision, *Renato K. v. Dep't of Homeland Sec.*, EEOC Appeal No. 0120141861, Agency No.

26

HSICE213582012 (Dec. 16, 2016), in which the EEOC Office of Federal Operations found that a supervisor's action of leaving EEO documents in plain sight on his desk and discussing an employee's EEO complaint with another employee was sufficient to trigger retaliation *per se*, on the theory that the dissemination of the information about the EEO complaint itself would deter an employee from filing such a complaint in the first place. Snyder has identified no federal case law support for this *per se* retaliation theory. When a court was confronted with more egregious facts consisting of a defendant's policy of posting and reading legal bills at meetings and identifying by name union members who had filed EEOC charges, it concluded that such a practice was not *per se* retaliation because the defendant engaged in this activity in order to obtain member approval for expenditures on legal bills, not to single out members who filed EEOC charges. *See Franklin v. Local 2 of the Sheet Metal Workers Int'l Ass'n,* 565 F.3d 508, 520–21 (8th Cir. 2009). In any event, the only evidence that Perrone shared information about Snyder's EEO complaint is Ferrer's testimony that after February 2017, six months after Snyder originally contacted the EEO Office and after Perrone had already recommended his suspension, Perone told her that Snyder, Vedula, and Hwang had filed EEO complaints mentioning her and that the allegations were unfounded, but Perrone provided no other information about Snyder's allegations. Under these circumstances, the Court does not find that the disclosure of such limited information, without any actual, materially adverse action against Snyder, alone constituted unlawful retaliation.

As to whether the evidence supports the conclusion that the suspension was retaliatory, HHS argues that there was no causal nexus between Snyder's initial EEO activity in August 2016 and his suspension in February 2017 because there was an almost six-month gap between those events. While there is no bright line rule on this issue, the United States Supreme Court has held that the temporal nexus must be "very close" to alone establish causation and has referenced cases

in which a three- or four-month lapse between protected activity and materially adverse action was too long to establish a causal connection by temporal proximity alone. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012). In fact, two months and two weeks separating the time between the protected activity and the plaintiff's termination has been found to be "sufficiently long so as to weaken significantly the inference of causation between the two events." *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003). Therefore, when the time between events is too great to establish causation based solely on temporal proximity, a plaintiff must present "other relevant evidence . . . to establish causation" such as "continuing retaliatory conduct and animus" in the intervening period. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). Particularly at the summary judgment stage, Snyder must show more than the fact that his suspension followed six months after his initial EEO contact to establish causation on his retaliation claim. *See id.*

Here, Snyder's formal EEO complaint was not filed until November 2016, only two months before the proposed suspension and three months before it was formally adopted. Snyder identifies deposition testimony by Ferrer in which she acknowledged that during a discussion in late 2016 or early 2017, Perrone expressed her "wish or desire that there was something they could do about Mike Snyder" as he had been a "problem child" and that "it was not the first issue with him," and that she did not "understand why they can't terminate him." J.A. 276. Ferrer also testified that Perrone "was working with HR on how to handle Mr. Snyder." J.A. 277. According to Ferrer, up to that point, Snyder had been "insubordinate," was the subject of complaints by others, and had been previously suspended for an inappropriate communication. *Id.* These statements do not directly convey an interest in taking adverse action against Snyder because he had filed an EEO complaint. Notably, they were more connected in time to the separate, non-EEO complaint, made

28

to the NIH Civil Division in December 2016, in which Snyder, Vedula, and Hwang complained about Ferrer's bullying and workplace violence. Thus, the value of these statements in establishing causation is limited. Nevertheless, viewing this evidence in the light most favorable to Snyder, the Court finds that where the suspension occurred within two to three months of the formal EEO complaint and Perrone made statements reflecting a desire to take action against Snyder, he has presented sufficient evidence on the issue of causation to satisfy the *prima facie* case requirements and to proceed to the next step of the analysis.

### B.      Legitimate Non-Retaliatory Reason

When a *prima facie* case has been established, the burden shifts to HHS to show a legitimate, non-retaliatory reason for the adverse action. Because this step "precedes the credibility-assessment stage," all that is required of the defendant at this point is the introduction of evidence which, if "*taken as true*, would *permit* the conclusion" that there was a non-retaliatory reason "for the adverse action." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (applying this standard to a discrimination claim). HHS is not required to prove the absence of a retaliatory motive. *Henson*, 61 F.3d at 274 (considering a discrimination claim).

Here, HHS offers the same reason that constituted the legitimate, non-discriminatory reason for issuing the suspension, that the decision was made pursuant to an independent Management Inquiry into the sexual harassment claim asserted by Ferrer. *See supra* part II.B. Indeed, Perrone has asserted that her proposal of a five-day suspension was based on the NIH Table of Penalties and consultation with Turley, an HR specialist. J.A. 68. Since Snyder had a previous two-day suspension for misconduct, the table called for discipline ranging from a five-day suspension to termination. Accordingly, Snyder's ultimate discipline was at the lowest end of the recommended penalty range. When Singleton and Perrone followed up with Ferrer, the victim

29

of the NBS meeting incident, Perrone told Ferrer that the five-day suspension was "all HR would allow for." J.A. 282. Thus, for the same reasons discussed as to the discrimination claim, the evidence meets HHS's burden of advancing a legitimate non-retaliatory reason for the suspension.

### C.    Pretext

The final step in the analysis is to assess whether the evidence supports a finding that the proffered non-retaliatory reason was pretextual, and that the true reason for the suspension was retaliation for protected activity. As the Supreme Court has stated in the analogous context of a discrimination claim, "[a]lthough intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas*] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Even if a plaintiff has established a *prima facie* case and presented evidence that the asserted justification for the action was false, the evidence may still be insufficient to support a finding of liability. *Id.* at 148. Thus, the Court must consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" to determine whether judgment as a matter of law is appropriate. *Id.* at 148–49. "[I]f the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment may be warranted. *Id.* at 148.

Here, Snyder has not identified sufficient evidence to support a finding that Snyder was suspended not because of his actions in the June 2016 NBS Meeting and the results of a

Management Inquiry, but because he had filed an EEO complaint. Although Snyder has identified various other statements by Perrone and Singleton beyond those already discussed, they do not, individually or collectively, meet the required threshold. Ferrer testified that sometime after February 2017, and thus after the suspension, Perrone and Singleton discussed Snyder's EEO complaint and stated that it was unfounded, "created a lot of work," and was "unnecessary." J.R. 278. Such statements, particularly when made after the suspension, do not reveal any retaliatory animus. Although in 2018 Perrone expressed an intention to make life difficult for Vedula and Hwang because they had filed EEO complaints, including by creating tasks at which they would fail and then publicly berating them so that they would want to resign, Ferrer acknowledged that these statements did not relate to Snyder. They also occurred in 2018, long after the February 2017 suspension and Snyder's retirement in May 2017. Likewise, the fact that when Snyder retired in May 2017, Perrone and Singleton were happy and called the decision "great news," J.R. 279, does not show that the earlier suspension was pretextual or motivated by a retaliatory animus.

Finally, Snyder has generally asserted that even after his suspension, he was also subjected to retaliation when his request to return to Plomann's group was denied and he had to return to NBS, because requiring him to work there effectively forced him to retire or face termination. But he identifies no evidence of any additional pressure or incidents against him from the time he returned to NBS in March 2017 until his retirement in May 2017. Rather, he has testified that the reason he retired was a just matter of "self-protection" because with his two prior suspensions for misconduct, he had "two strikes" and could potentially be removed from federal service if he had a third incident. J.A. 24, 110. Under these circumstances, there is no evidence that any materially adverse actions were taken against Snyder after his suspension that could constitute retaliation.

31

Thus, while Perrone and Singleton made statements reflecting frustration with Snyder as an employee, and Perrone made statements suggesting a desire to retaliate against other NBS employees long after Snyder had retired, there is ultimately no evidence showing that Perrone and Singleton decided to impose the suspension on Snyder as retaliation for the filing of his EEO complaint. Even when considering the facts in the light most favorable to Snyder, the Court finds that a reasonable jury would not be able to conclude that HHS's legitimate, non-retaliatory reason for suspending Snyder was pretextual, and that the suspension was actually the result of unlawful retaliation for Snyder's EEO complaint. *See Holland*, 487 F.3d at 218 (granting summary judgment where there was insufficient evidence to show that a termination was based on retaliation rather than the plaintiff's threatening behavior). The Court will grant HHS's Motion as to this claim.

## CONCLUSION

For the foregoing reasons, HHS's Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date:  August 10, 2020

THEODORE D. CHUANG
United States District Judge